## ARGUED AND DETERMINED

### IN THE

# SUPREME COURT

#### OF

# NORTH DAKOTA

---

NORTHERN TRUST COMPANY a Corporation, v. FIRST NATIONAL BANK OF BUFFALO, a Corporation.

(156 N. W. 212.)

Action by a surety to compel restitution of county funds paid by the treasurer to defendant upon a private indebtedness. See Northern Trust Company v. First Nat. Bank, 25 N. D. 74.

Restitution of county funds — action for — surety — evidence — treasurer — checks — shortage of funds — county — damages.

1. Evidence examined and found to sustain the holding of the trial court that said treasurer was short in his accounts at the time of the issuance of each and every one of the checks in question; that the issuance of each of said checks created a shortage to the damage of said county; that the money used by said treasurer to pay his private indebtedness was at all times the money of said county.

Evidence — shortage — treasurer — county commissioners — public examiner — school districts — funds — payment.

2. Evidence examined and found to sustain the holding of the trial court that said shortage was never even temporarily made good; that the treasurer deceived the county commissioners and the public examiner, through books

33 N. D.—1.

which did not show the timely receipt of moneys coming into his hands as
county treasurer; said books further showing the payment of funds to certain
school districts, which payments were not, in fact, made.

**Treasurer — county commissioners — shortage — settlement between — em-
bezzlement — concealment of — such settlement not binding.**

3. Settlement between an embezzling treasurer and the county commissioners,.
obtained by concealment of the embezzlement, is not binding upon the county.

**Defaulting treasurer — books of — county cash — condition of — proof of ac-
curacy — evidence — admissible.**

4. Certain books kept by the defaulting treasurer through a deputy, showing
the true condition of the county cash, proved by competent testimony to be
accurate at the time they were made and without which the true condition of
the county cash could not be ascertained, are admissible as evidence in an
action of this kind.

Opinion filed December 28, 1915.   Rehearing denied February 8, 1916.

Appeal from the District Court of Cass County.  *Pollock, J.*
Affirmed.

*Lawrence & Murphy* and *Pollock & Pollock,* for appellant.

In legal effect, this action is by Cass county against the defendant.
The cause of action accrues when consequential injury has followed
official nonfeasance or misfeasance, and not before.   Northern Trust
Co. v. First Nat. Bank, 25 N. D. 74, 140 N. W. 705; 3 Sutherland,
Code Pl. p. 2828; Brooks v. The Governor, 17 Ala. 806; Johnson v.
Marshall, 34 Ala. 526.

"The procurement of the money by one from his friends, and placing
it in the vaults of the bank, was a payment of the money he had before
taken out for his own purposes.   It thus became the property of the
defendant."   Ingraham v. Maine Bank, 13 Mass. 208; Independent
School Dist. v. Hubbard, 110 Iowa, 58, 80 Am. St. Rep. 271, 81 N. W.
244; Pine County v. Willard, 39 Minn. 125, 1 L.R.A. 118, 12 Am. St.
Rep. 622, 39 N. W. 72.

Sureties on the last bond are liable also for moneys paid to their prin-
cipal during the term covered by the bond, but because of transactions
which took place during the preceding term, even if such moneys are
used to cover up defalcations occurring during a preceding term of the

officer. 29 Cyc. 1458, 1459; Mechem, Pub. Off. § 287; Throop, Pub. Off. § 219, pp. 235, 236.

Where state officers fail to perform their duties in requiring settlements from the treasurer, and of suing promptly on default, the surety is not discharged from liability. Crawn v. Comp. 84 Va. 282, 10 Am. St. Rep. 839, 4 S. E. 721; Lauderdale County v. Alford, 65 Miss. 63, 7 Am. St. Rep. 637, 3 So. 246; Linville v. Leininger Twp. 72 Ind. 491, and cases cited; Bocard v. State, 79 Ind. 270; Brown v. State, 78 Ind. 239; Goodwine v. State, 81 Ind. 112; Ingraham v. Maine Bank, 13 Mass. 208.

When money was in the treasurer's hands, there was nothing to identify it, or to distinguish it from other funds under his control, or rightfully belonging to him. Colerain v. Bell, 9 Met. 499; Gwynne v. Burnell, 7 Clark & F. 572, West, 342, 1 Scott, N. R. 711, 6 Bing. N. C. 853; State v. Sooy, 39 N. J. L. 539; Com. ex rel. Mechanicsburg v. Knettle, 182 Pa. 176, 38 Atl. 13; Pine County v. Willard, 39 Minn. 125, 1 L.R.A. 118, 12 Am. St. Rep. 622, 39 N. W. 71; Crawn v. Com. 84 Va. 282, 10 Am. St. Rep. 839, 4 S. E. 721; Rogers v. State, 99 Ind. 218; Stone v. Seymour, 15 Wend. 19; Hecox v. Citizens' Ins. Co. 9 Biss. 421, 2 Fed. 535; State use of Buchanan v. Smith, 26 Mo. 226, 72 Am. Dec. 204; American Bonding & Trust Co. v. Milwaukee Harvester Co. 91 Md. 733, 48 Atl. 74.

Where an officer holds for several, or more than one term, and it is afterwards discovered that he was in default, it will be presumed, in the absence of proof to the contrary, that the default took place during his last term, and the sureties on his last bond would be liable. United States v. Earhart, 4 Sawy. 245, Fed. Cas. No. 15,018; Heppe v. Johnson, 73 Cal. 265, 14 Pac. 833; Kagay v. Trustees of Schools, 68 Ill. 75; Pape v. People, 19 Ill. App. 24; Fox Dist. Twp. v. McCord, 54 Iowa, 346, 6 N. W. 536; Bernhard v. Wyandotte, 33 Kan. 465, 6 Pac. 617; Stoner v. Keith County, 48 Neb. 279, 67 N. W. 311; Clark v. Douglas, 58 Neb. 571, 79 N. W. 158; Kelly v. State, 25 Ohio St. 567; Vaughan v. Evans, 1 Hill, Eq. 414.

If the contrary position is taken, the burden of proof is upon them to show that the default occurred before their bond was given. Weakley v. Cherry Twp. 62 Kan. 867, 63 Pac. 433; Readfield v. Shaver, 50 Me. 36, 79 Am. Dec. 592; Pine County v. Willard, 39 Minn. 125, 1

L.R.A. 118, 12 Am. St. Rep. 622, 39 N. W. 71; Board of Education v. Robinson, 81 Minn. 305, 83 Am. St. Rep. 374, 84 N. W. 105; State v. Bobleter, 83 Minn. 479, 86 N. W. 461; Hetten v. Lane, 43 Tex. 279; Parsons v. Miller, 46 W. Va. 334, 32 S. E. 1017; Parker v. Medsker, 80 Ind. 158; Com. ex rel. Mechanicsburg v. Knattle, 182 Pa. 176, 38 Atl. 13; Custer County v. Tunley, 13 S. D. 7, 79 Am. St. Rep. 870, 82 N. W. 84.

Where money is in any manner brought into the treasury, even though it was intended to be and was afterwards again abstracted, the surety would be liable, and this is true even though such money was abstracted to pay liabilities incurred by the officer during his first term, where the money was received by the county treasurer in good faith. Pine County v. Willard, 39 Minn. 125, 1 L.R.A. 118, 12 Am. St. Rep. 622, 39 N. W. 72; State use of Buchanan County v. Smith, 26 Mo. 226, 72 Am. Dec. 204; People v. Hammond, 109 Cal. 384, 42 Pac. 36; Throop, Pub. Off. § 219; Anaheim Union Water Co. v. Parker, 101 Cal. 483, 35 Pac. 1084.

The doctrine is that the officer, when he enters upon a second term, must be presumed, in the absence of evidence to the contrary, to have on hand all the funds with which he is chargeable. Fox Dist. Twp. v. McCord, 54 Iowa, 346, 6 N. W. 537; Rogers v. State, 99 Ind. 218; 15 Decen. Dig. p. 754.

Where the same person holds the offices of county treasurer and of school district treasurer, and leaves school moneys to the credit of the county, to keep his county funds proper, he is short as school treasurer, and there and so liable, and there was no default as county treasurer. The county had its money, and it was not injured. Butte County v. Morgan, 76 Cal. 1, 18 Pac. 115.

Where the funds of a municipality are actually produced and accounted for as required by law, and settlement is effected, in the absence of fraud or mistake, this is conclusive, and no inquiry will be tolerated concerning the source whence any of the necessary money was derived. Boone County v. Jones, 54 Iowa, 699, 37 Am. Rep. 229, 2 N. W. 987, 7 N. W. 155; Morley v. Metamora, 78 Ill. 394, 20 Am. Rep. 266; Gage v. Chicago, 2 Ill. App. 332; Independent School Dist. v. Hubbard, 110 Iowa, 58, 80 Am. St. Rep. 271, 81 N. W. 242.

It being a payment and settlement, it was no concern of the county

where or how the money was procured. Fremont County v. Fremont County Bank, 145 Iowa, 8, 123 N. W. 782, Ann. Cas. 1912A, 1220.

The presumption of the law is against defalcation. Independent Dist. v. King, 80 Iowa, 500, 45 N. W. 908; District Twp. v. Hardinbrook, 40 Iowa, 130; Independent School Dist. v. Hubbard, 110 Iowa, 58, 81 N. W. 243.

It is presumed that an officer, succeeding himself in office, pays over to himself, as his own successor, the moneys on hand at the end of his prior term. Custer County v. Tunley, 13 S. D. 7, 79 Am. St. Rep. 870, 82 N. W. 84; State ex rel. Causey v. Causey, 93 S. C. 300, 76 S. E. 707.

A report made by a treasurer as part of his official duty, showing the amount of funds in his hands at the execution of his second bond, is binding on the sureties thereto. Cawley v. People, 95 Ill. 249; 11 Cyc. 449, note; Cowden v. Trustees of Schools, 235 Ill. 604, 23 L.R.A. (N.S.) 131, 126 Am. St. Rep. 244, 85 N. E. 924; Roper v. Sangamon Lodge, 91 Ill. 518, 33 Am. Rep. 60; Longan v. Taylor, 130 Ill. 412, 22 N. E. 745; Boone County v. Jones, 54 Iowa, 699, 37 Am. Rep. 229, 2 N. W. 987, 7 N. W. 155; Chicago v. Gage, 95 Ill. 593, 35 Am. Rep. 199; Strong v. United States, 6 Wall. 788, 18 L. ed. 740; State v. Sooy, 39 N. J. L. 539; Seymour v. Van Slyck, 8 Wend. 403; Stone v. Seymour, 15 Wend. 19; Sandwich v. Fish, 2 Grey, 298; Morley v. Metamora, 78 Ill. 394, 20 Am. Rep. 266; Roper v. Sangamon Lodge, 91 Ill. 518, 33 Am. Rep. 60; Cawley v. People, 95 Ill. 249; Lauderdale County v. Alford, 65 Miss. 63, 7 Am. St. Rep. 637, 3 So. 246; Ingraham v. Maine Bank, 13 Mass. 208.

The fact that the county commissioners knew, when they accepted his bond, that the treasurer had been chargeable with conversion of funds during the prior term, does not avoid the bond. Pine County v. Willard, 39 Minn. 125, 1 L.R.A. 118, 12 Am. St. Rep. 622, 39 N. W. 71; Gwynne v. Burnell, 7 Clark & F. 572, West, 342, 1 Scott, N. R. 711, 6 Bing. N. C. 853; Colerain v. Bell, 9 Met. 499.

No specific personal property is involved in this action. It is solely a question of money—not specific money, but a liability in money. And the identity of such cannot be established by a person's books of account, used as evidence upon issues between third parties. As to the party against whom they are sought to be used in such an action, such

books are private books.   Powers v. Hazelton & L. R. Co. 33 Ohio St.
436; Pittsburgh & L. E. R. Co. v. Cunnington, 39 Ohio St. 327; Kerns
v. McKean, 76 Cal. 87, 18 Pac. 122; Ridgeley v. Johnson, 11 Barb.
527; Pittsburgh, C. & St. L. R. Co. v. Noel, 77 Ind. 110; State Bank
v. Brown, 53 L.R.A. 513, and note 11, 165 N. Y. 216, 59 N. E. 1.

   *Pierce, Tenneson, & Cupler,* and *Watson & Young,* for respondent.

   Defendant's persistent assertion that there was no shortage as far as
the county was concerned, and that if there was any embezzlement it was
that of school district money, is wholly beside the question.   The money
was collected by the officer as county treasurer; it belonged to the county
until there was a distribution to, and setting apart of the funds to, the
school district.   Walker v. State, 176 Ind. 40, 95 N. E. 353.

   Under such conditions the abstracting of any part of it was an em-
bezzlement of the funds of the county.   Armstrong v. State, 145 Ind.
609, 43 N. E. 866; Hollingsworth v. State, 111 Ind. 289, 12 N. E.
490; Kennedy v. Miller, 97 Cal. 429, 32 Pac. 558; Gridley School
Dist. v. Stout, 134 Cal. 592, 66 Pac. 785; Detroit v. Weber, 29 Mich.
24.

   The burden of proof is on defendant to show shortage repaid.   Dick-
inson v. White, 25 N. D. 523, 49 L.R.A.(N.S.) 362, 143 N. W. 754.

   The cashing of the checks in question created a shortage in the bank
accounts of Cass county, and that such shortage was never made good.
Oakland v. Snow, 145 Cal. 419, 78 Pac. 1060.

   The exhibits—the ledger and cash book—kept by the treasurer,
and properly identified as such, and as to their accuracy, were admis-
sible in evidence to show the shortage.   Laws 1907, chap. 118, Rev.
Codes 1905, §§ 7298 & 7299, Comp. Laws 1913, §§ 7917, 7918.

   And the statutory requirement that certain books and records are to
be kept by the officer is not in all cases a prerequisite to the admission of
the same as evidence.   State v. Hall, 16 S. D. 6, 65 L.R.A. 151, 91 N.
W. 325; Jones, Ev. § 511 and cases cited in note 82; Coleman v. Com.
25 Gratt. 865, 18 Am. Rep. 711; Kyburg v. Perkins, 6 Cal. 675; Coop-
er v. People, 28 Colo. 87, 63 Pac. 314; Hesser v. Rowley, 139 Cal. 410,
73 Pac. 156; Lynn v. Cumberland, 77 Md. 449, 26 Atl. 1001; State
Bank v. Brown, 165 N. Y. 216, 53 L.R.A. 513, 59 N. E. 1.

   "To make entries upon account books admissible in evidence, it is
not always necessary that the transactions to which they relate or apply

should have been directly between the original creditor and debtor."
Bridgewater v. Roxbury, 54 Conn. 213, 6 Atl. 415.

Especially where the entries so made and kept are against the interests of the party making them at that time. Poor v. Robinson, 13 Bush, 290; Livingston v. Tyler, 14 Conn. 493; Still v. Reese, 47 Cal. 294; Jones v. Howard, 3 Allen, 223; Bridgewater v. Roxbury, 54 Conn. 213, 6 Atl. 415; Zang v. Wyant, 25 Colo. 551, 71 Am. St. Rep. 145, 56 Pac. 565; Humphrey v. People, 18 Hun, 393; American Surety Co. v. Pauly, 18 C. C. A. 644, 38 U. S. App. 254, 72 Fed. 470, affirmed in 170. U. S. 133, 42 L. ed. 977, 18 Sup. Ct. Rep. 552; Nicholls v. Webb, 8 Wheat. 326, 5 L. ed. 628; Hancock v. Kelly, 81 Ala. 368, 2 So. 281; Dow v. Sawyer, 29 Me. 117; State v. Phair, 48 Vt. 366; Hatfield v. Perry, 4 Harr. (Del.) 463; Wood v. Coosa & C. R. Co. 32 Ga. 273.

"Books of account kept by a deceased agent, proved to be in his handwriting, are admissible in evidence in favor of his principal against a third party, where on inspection they appear to have been fairly kept, in the regular course of the business of his agency, and relating to the matter in controversy." Dow v. Sawyer, 29 Me. 117; Grover v. Morris, 73 N. Y. 473; Rand v. Dodge, 17 N. H. 343; Vinal v. Gilman, 21 W. Va. 301, 45 Am. Rep. 562; Agricultural Ins. Co. v. Keeler, 44 Conn. 161; Glover v. Hunter, 28 Ind. 185; Morrell v. Adams Exp. Co. 1 Walk. (Pa.) 388; Whitnash v. George, 8 Barn. & C. 556; State Bank v. Johnson, 1 Mill, Const. 404, 12 Am. Dec. 645; Post v. Kenerson, 72 Vt. 341, 52 L.R.A. 562, 82 Am. St. Rep. 948, 47 Atl. 1072.

Settlements made between the county treasurer and the commissioners are not conclusive upon the county, where there had been embezzlement and same had been concealed from the commissioners, or where all the material facts are not known. Goose River Bank v. Willow Lake School Twp. 1 N. D. 26, 26 Am. St. Rep. 605, 44 N. W. 1002; Capital Bank v. School Dist. 1 N. D. 479, 48 N. W. 363; Engstad v. Dinnie, 8 N. D. 1, 76 N. W. 292; Hosmer v. Sheldon School Dist. 4 N. D. 197, 25 L.R.A. 383, 50 Am. St. Rep. 639, 59 N. W. 1035; State ex rel. Diebold Safe & Lock Co. v. Getchell, 3 N. D. 243, 55 N. W. 585; Fox v. Walley, 13 N. D. 610, 102 N. W. 161.

Laches in prosecuting such claims cannot be set up in bar of the suit, nor can negligence of the examining officers. Storey v. Murphy, 9 N.

D. 115, 81 N. W. 23; United States v. Kirkpatrick, 9 Wheat. 720, 6 L. ed. 199; United States v. Vanzandt, 11 Wheat. 184, 6 L. ed. 448; Detroit v. Weber, 26 Mich. 284; Newark v. Stout, 52 N. J. L. 35, 18 Atl. 943; Palo Alto County v. Burlingame, 71 Iowa, 201, 32 N. W. 259; Bush v. Johnson County, 48 Neb. 1, 32 L.R.A. 223, 58 Am. St. Rep. 673, 66 N. W. 1023; Jefferson County v. Lineberger, 3 Mont. 231, 35 Am. Rep. 462; State v. Edwards, 89 S. C. 224, 71 S. E. 826; Newburyport v. Davis, 209 Mass. 126, 95 N. E. 110.

County authorities in making settlements with the officials act ministerially rather than judicially, and their determination is no more conclusive than a settlement between private persons. Throop, Pub. Off. §§ 282–285; State v. Krause, 58 Kan. 651, 50 Pac. 882; Newark v. Stout, 52 N. J. L. 35, 18 Atl. 943; Rogers v. State, 99 Ind. 218; Zuelly v. Casper, 37 Ind. App. 186, 76 N. E. 646; Kinney v. People, 4 Ill. 357; Washington County v. Parlier, 10 Ill. 232; Hunt v. State, 93 Ind. 311; Satterfield v. People, 104 Ill. 448; State use of Carroll County v. Roberts, 62 Mo. 388; Burlington Justices v. Fennimore, 1 N. J. L. 190; Ferry v. King County, 2 Wash. 337, 26 Pac. 537; Cumberland County v. Edwards, 76 Ill. 544; Palo Alto County v. Burlingame, 71 Iowa, 201, 32 N. W. 259; Bush v. Johnson County, 48 Neb. 1, 32 L.R.A. 223, 58 Am. St. Rep. 673, 66 N. W. 1023; Rush County v. State, 103 Ind. 497, 3 N. E. 165; Jefferson County v. Lineberger, 3 Mont. 231, 35 Am. Rep. 462; Jefferson County v. Jones, 19 Wis. 52; Sexton v. Richland County, 27 Wis. 349; Heritage v. State, 43 Ind. App. 595, 88 N. E. 114.

Findings of the trial court in actions at law, where a jury has been waived, are entitled to the same weight as a verdict of a jury, and same will not be disturbed, unless against the clear preponderance of the evidence. James River Nat. Bank v. Weber, 19 N. D. 702, 124 N. W. 952.

Burke, J. Appeal from a trial to the court without a jury. Although both respondent and appellant insist that there is no dispute as to the material facts, we find that they disagree when it comes to their statements. In the 1906 elections, one McConville, who was serving as deputy county treasurer of Cass county, was elected treasurer. He was,

however, short in his accounts as deputy, and to make up such shortage borrowed $2,500 of defendant.

It was agreed by McConville that this $2,500 should be repaid to the bank from his salary as county treasurer at the rate of $100 and interest per month. January 4, 1907, McConville became treasurer, and the Northern Trust Company furnished his official bond. January 7, three days later, McConville extracted $112.11 from the cash drawer; January 26, $190.99; January 31, $10,—a total of $313.10. January 10th he issued a check upon the deposits of Cass county in favor of the Union Light, Heat, & Power Company for $7.46; January 7, to T. M. Roberts, check for $1.37,—a total of $9.83. Thus, upon February 1st, he had used $322.93 of county money as against his salary of $192.90. This fact is material because it shows a shortage from the very beginning. The first check issued in payment of this indebtedness to the Buffalo bank was on April 10, 1907, for $108.66. At this date he had taken from the cash drawer, moneys, belonging to the county, $804.69, and he issued county checks to pay his private indebtedness in the further sum of $55.81, a total of $860.55. His salary for January, February, and March amounted to $609.56. He was therefore $250 short before the issuance of the first check to the defendant. From that time on, this shortage continued, until, at the end of two terms, he had extracted from the cash drawer, $10,655.11, and had written unauthorized checks in the sum of $9,034.85, a total of $19,689.96. His salary amounted to $9,841.58, leaving a shortage of $9,848.38. He claimed, however, a commission for handling certain funds, which, if allowed, would reduce the shortage to $7,258.28. The county contests the allowance of this commission, but it is not material to this litigation. McConville pleaded guilty to embezzlement and was sentenced to the penitentiary. Cass county recovered judgment against the trust company upon the bond in something over $7,500. During the four years in office, McConville had issued checks drawn upon the funds of Cass county to the First National Bank of Buffalo for $2,564.22 upon his private indebtedness to the bank, and now the trust company brings action against the bank for said sums, claiming to be subrogated to the rights of Cass county. The bank at first demurred, but in Northern Trust Co. v. First Nat. Bank, 25 N. D. 74, 140 N. W. 705, this court held that the complaint stated a cause of action. Upon trial below to

the court without a jury, findings of fact and conclusions of law favorable to plaintiff were entered. This appeal is from the judgment. Some of the questions which would otherwise arise have been settled in the former appeal. Appellant no longer questions the right of subrogation, but divides his present defense into four portions, which will be treated in the four paragraphs following:

(1) Appellant claims that "plaintiff has wholly failed to establish that the issuance of the checks in question created any shortage or caused any damage to the county of Cass, and that the evidence in the case is undisputed that no shortage was caused or created by the issuance of the checks in question." It is his claim that moneys were secured from other sources, partly from school districts, to make good the shortage, and that said funds were kept in the county depositaries sufficient at all times to meet any demand that Cass county might have had against McConville. He states in his brief: "Cass county on any day from the 4th of January, 1907, to February 9, 1909, could have taken Mr. McConville out of his office, removed him before any entry had been made upon the books, appointed a new treasurer, such treasurer over his official signature as treasurer of Cass county could have withdrawn from the vaults of the various banks of Cass county every dollar which was due and owing to Cass county." And again: "Amounts appearing upon the books of the county treasurer were paid over to McConville as school district treasurer by making a record of the same and separating the same in the accounts from the county money. Instead, however, of using this money for school district purposes, McConville placed it in the name of Cass county, and gave Cass county the title to it; whether it was taken by permitting it to remain in the vaults of the county treasurer, or was withdrawn and then replaced annually, is immaterial. . . . He was short actual cash as school district treasurer, not as county treasurer." Appellant further states: "The ultimate and important fact is that when the school districts or other persons from whom McConville had embezzled money to use as county treasurer subsequently received their money, then, and not until then, was McConville unable to produce money to fulfil his liabilities to the county, and that is when the first shortage occurred which caused injury or damage to the county of Cass." Appellant's position

is ingenious, but unsound. A study of the testimony will not bear out his contention.

When McConville was elected treasurer the law authorized the county superintendent of schools to appoint the county treasurer as treasurer of any school district in the county under certain contingencies. McConville thus became the treasurer of four school districts. Section 1472, Comp. Laws 1913, provides: "All funds of each and every city or school district of this state shall be deposited by the treasurer of the city, county, or school district, as soon as received by him, in the name of the city or school district of which he is an officer, in such bank or banks as shall have been designated as city or school district depositaries in accordance with this article, as hereinafter provided." One of the ways in which McConville concealed his shortage with the county was to pretend to turn over to himself as school district treasurer moneys for the school district, but, in fact, leave all of said money in the county deposits. Another way was to delay the issuance of tax receipts.

The testimony of the deputy, Mayo, follows:

A. Every time an examination was made, whether by the county commissioners or by the public examiner, there was money on hand to balance the report as they found it—Otherwise, why, there would be a stopper right there.

By the Court. How did that all come about, Mr. Mayo?

A. Well, now, I could explain if I had permission to do it my own way.

. . . Now, say, for instance, the public examiner comes along in February. The penalty goes on taxes the first of March and during the month of February there would be possibly $200,000 that will come into that office that there is not a receipt issued for. There is nothing to prevent the treasurer from taking $100,000 at that time and still have money enough to settle up everything easily.

By the Court. That is, $100,000 money that he has not given a receipt for yet?

A. Yes. You know those tax receipts—some people do not get their tax receipts until sixty days after the first of March. They cannot be gotten out in one day—cannot be gotten out in a month.

Q. He wasn't charged with it in that report which you say he made, was he?

A. No, he was not.

Q. He was charged with a less amount than he actually had on hand; is that right?

A. He wouldn't be charged with any money until receipts of some kind had been issued for that money.

Q. So that in the interim and until those receipts were issued, he apparently had more money in the bank than he was charged with; that is correct, isn't it?

A. Yes, sir.

. . . . . . . . . . . . . . . . . . .

Q. Now, do you mean, Mr. Mayo, that the depletion of the bank account, which you say was caused by the issuance of each of these checks which was offered in evidence, was made up, or did he continue short?

A. It was only—

Q. Did he make it up?

A. Did he—no.

Q. He didn't, did he? He was short all the time, wasn't he, Mr. Mayo?

A. His account was overdrawn all the time.

Q. Now, if the examiner had looked in this ledger which you say you kept, and which is offered here as exhibit B, he would have immediately seen that he was short?

A. Yes, sir.

Q. All the time?

A. Yes, sir.

Q. The true condition of the accounts wasn't shown by those reports or county books?

A. No, sir.

. . . . . . . . . . . . . . . . . . .

This witness testifies that he kept track of the shortage by means of two correct cash books or ledgers, known as exhibits A and B, being the exhibits which we hold admissible in paragraph 4.

One Thompson, expert accountant, also testified that a thorough ex-

amination of the books showed a shortage at the time each check was issued to defendant.

We quote from his testimony:

Q. Now, did you make any examination of the books to ascertain whether or not, at the time of the drawing of the checks to the First National Bank of Buffalo, McConville had withdrawn cash from the drawer in excess of the salary earned at that time?

A. Yes, sir, I did.

Q. Just take your book there and give us the result of your computation as to the first check that was drawn to the First National Bank of Buffalo.

A. Was for $108.66. . . . Up until the time that this check was drawn and paid, he had drawn out in actual cash from the cash drawer, $804.69, and had deposited salary warrants, including the warrant deposited April 2d, of only $609.56, so that he had drawn cash in excess of his salary warrants to the amount of $195.13, when this first check was issued.

. . . . . . . . . . . . . . . . . . .

Q. Now going down, without stopping to take each check, go down to the last of the account and at the last of the checks and give us the standing of his accounts at the time he drew that check. . . . Well, your final footings now would include all of the twenty-six checks. What was the standing of his account at that time?

A. That would include the last check that was drawn. He had withdrawn cash, $10,655.17, and had put in the cash drawer salary warrants amounting to $9,841.58, so that the excess of cash withdrawn was $813.59. . . .

Q. You can tell the standing of his account at any time?

A. At any time.

Q. That he drew any one check?

A. Yes.

. . . . . . . . . . . . . . . . . . .

Q. So that the salary warrants which he put in the cash drawer, as you say, did not cover the actual cash which he had withdrawn from the drawer?

A. No.

. . . . . . . . . . . . . . . . . . .

(Upon Cross-Examination)

Q. In other words, you found a bookkeeping shortage?

A. No, an actual shortage.

Q. But you do not know of any actual physical shortage, at any time except at the end of the term?

A. And every day during the term.

. . . . . . . . . . . . . . . . . .

Q. But, on the other hand, he could have settled on the official books · and produced every dollar due the county, if he had produced according to their records, couldn't he?

A. No, sir. He would have to settle according to the auxiliary books (A and B).

Q. How did he settle with the county commissioners from time to time, as they reported that he had sufficient funds on hand? They did not have the auxiliary books before them?

A. He was not examined properly.

Q. So far as his examination disclosed, there might have been sufficient money in the banks and in the cash drawer on the 1st day of January to have fulfilled every obligation against Mr. McConville, might there not?

A. No, there could not because his cash book—this auxiliary cash book (A or B)—shows what cash he had on hand.

. . . . . . . . . . . . . . . . . .

Q. Can you from this book, from the cash book, exhibit A, by computation at any time on any of the dates these checks were issued, ascertain the amount of money which was on deposit at the various banks?

A. Yes, sir. It would be a long computation, but it could be done.

. . . . . . . . . . . . . . . . . .

Mr. Thompson then explained the handling of the school district funds as follows: "He had at different times large sums in his hands as treasurer of school district No. 96. . . . Mr. McConville would get a warrant from the auditor's office for school district No. 96. . . . This warrant would read, payable to H. A. McConville, treasurer of school district No. 96. He would take that warrant, put it in as so much cash, and turn to his auxiliary set and give school district No. 96 credit for that amount of money.

Q. But would he pay the money to school district No. 96 at that time?

A. Instead of taking that money out and depositing it to the credit of H. A. McConville, treasurer, and disbursing it in a separate account, as the present treasurer does, he would put it in Cass county money.

Q. You mean he would take it out of Cass county moneys? It was there all the time.

A. He simply canceled the warrant.

Q. Did he not receive this money from the taxpayers as county treasurer in the first place?

A. In the first place.

Q. And have it in his possession all the time?

A. All the time.

Q. Now, when he received a warrant payable to H. A. McConville, treasurer of school district No. 96, you say he did not pay that warrant in cash at the time?

A. No.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

Q. Now, that is one of the methods, is it, by which Mr. McConville could have fooled the county commissioners or whoever examined his office?

A. Yes, sir.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

Q. And an examination of the auxilliary books (A & B) would have disclosed immediately that the school district had not been paid that money?

A. Yes, sir, every time.

Q. And that the shortage really existed in the account of H. A. McConville?

A. In the debit item of H. A. McConville.

Q. Did you make an investigation to ascertain how much McConville was short, and of what items it consisted?

A. I did; yes, sir.

Q. What was it?

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

A. The total amount withdrawn from the county funds in the banks

by cash and checks charged to the account of H. A. McConville was $9,848.44.

Q. Can you state from your examination of the books whether any part of the money has ever been restored to Cass county?

A. By McConville? No.

Moreover, an examination of exhibits A and B shows conclusively that at the time each separate check was drawn to the Buffalo bank the shortage was increased in McConville's account with the county. This shortage is a real, and not a "bookkeeping," shortage. From the testimony of the witnesses already quoted and from the examination of exhibits A and B, it appears that the cash book kept by McConville, and exhibited to the examiner and to the county commissioners, was inaccurate and false at the time it was exhibited to those officials. For instance, if a resident of one of the outlying precincts should send a check for $50 to pay his taxes, McConville would place this $50 in the cash drawer, and would not enter the amount upon the books nor charge himself, as county treasurer, with the same until a later date. This $50, with other similar accounts, was used by McConville to conceal a shortage caused when he had taken money from the cash drawer. Let us say that there were $7,000 worth of such checks in the county funds, and he was deposed as treasurer. The taxpayers who had furnished this money would sue the county, showing that their checks had reached the treasurer's office and had been deposited to the credit of the county; can it be doubted that Cass county would be liable? And again let us suppose that McConville pretended to pay out $7,000 of the county's money to himself as treasurer of one of the school districts, but that in fact the money remained in the Cass county treasury. Supposing, then, that McConville was removed as county treasurer, and the school district sued Cass county for the money, showing that this particular $7,000 had always remained part of the Cass county funds. Can it be doubted that the school district would recover judgment? The fact that appellant by leading questions induced the witness Mayo to testify that there was always cash on hand to balance the *report furnished by McConville to the county commissioners* is immaterial. The question is not whether there was money enough to balance a set of doctored books, but whether there was money enough to pay what McConville owed Cass county.

It is therefore too plain for argument that each and every check issued by McConville upon the Cass county funds to pay his private debt to the bank constituted a shortage in the county funds which existed from that time until paid by the trust company, and that this shortage was never made good by McConville.

(2) Appellant's next defense is: "Subsequent to the issuance of the checks in question, full and complete settlement was had between the county of Cass and the county treasurer involved, and said county received all moneys due it from said county treasurer, and that said settlement is conclusive upon said county and this plaintiff." Much that we have said in paragraph 1 applies to this defense. McConville did not make good his shortage, but deceived the county commissioners through false reports. Neither is there merit in the contention that the county was bound by those settlements. It is elementary that settlements obtained by fraud with the officers of corporations are not binding upon the corporation. Such has been the holding of our court in Goose River Bank v. Willow Lake School Twp. 1 N. D. 26, 26 Am. St. Rep. 605, 44 N. W. 1002; Capital Bank v. School Dist. 1 N. D. 479, 48 N. W. 363; Hosmer v. Sheldon School Dist. 4 N. D. 197, 25 L.R.A. 383, 50 Am. St. Rep. 639, 59 N. W. 1035; State ex rel. Diebold Safe & Lock Co. v. Getchell, 3 N. D. 243, 55 N. W. 585; Engstad v. Dinnie, 8 N. D. 1, 76 N. W. 292; Fox v. Walley, 13 N. D. 610, 102 N. W. 161; See also notes in 7 L.R.A.(N.S.) 1187, and 118 Am. St. Rep. 546; 11 Cyc. 442, from which we quote: "County authorities, in making settlements with the officials, act ministerially, rather than judicially, and their determination is no more conclusive than a settlement between private persons." Cases supporting this text will be found under the Cyc. citation.

(3) Appellant's third defense is that the records "of the county of Cass established such settlement with said county treasurer and the fact that all the county's moneys were on hand, and such records are conclusive upon the said county and the plaintiff." This defense is completely answered by what we have said in paragraph 2.

(4) Appellant's fourth defense is that "all the rights of the plaintiff, and his theory of establishing the liability upon the defendant, are based upon the evidence furnished by certain private books. These books are claimed by the defendant to be inadmissible, and if not

properly admitted in evidence there is no proof whatever of any short-age." A complete answer to this defense is that a shortage is proven by other competent testimony as we have shown in paragraph 1. But there is no doubt about the admissibility of exhibits A and B. Those books are before us, and each one is a large book, sheep-bound, 18" x 12" x 2", containing 425 and 600 pages respectively. Those books are nearly filled with the cash accounts of Cass county. From the testimony it is evident that an accurate examination of the county funds could not be had without those books. Mr. Thompson testified that a complete examination shows that they were correctly kept and accurate. They are almost entirely in Mr. Mayo's handwriting, a few entries being found in the handwriting of Mr. McConville.

Mr. Mayo says:

Q. Did you keep that (exhibit B) for the purpose of knowing what the condition of your cash was at any time you might want to turn to the books?

A. Yes, sir.

Q. Did you keep them for the purpose of ascertaining the condition of your bank account with those different depositaries at any time you might want to turn to the books?

A. That is the only place that that depositary system was kept.
. . .

Q. Well, now, is it a fact that the auxiliary books were kept for the purpose and were necessary in order to show the true condition of the office at any time in a county like Cass?

A. Yes, sir. It is, absolutely.

The books in question were admissible for several reasons. First, Mr. Mayo was a witness and had a right to use these books as memorandum to refresh his memory. He had testified that they were in his handwriting and were accurate when made. Again, they were admissible as part of the *res gestæ*. They are also admissible as official records because they were necessary to an understanding of the affairs of the office. The respondent also claims that they were admissible under § 7909, Comp. Laws 1913. The authorities sustain their admission as public records. Jones on Evidence, § 511, states: "In the United States, somewhat greater latitude seems to have been allowed,

and it has frequently been held that such entries are admissible, if made in the course of official duty, although not required to be made by law." 1 Greenleaf on Evidence, 14th ed. § 496, note, says: "Whenever a written record of the transactions of a public officer in his office is a convenient and appropriate mode of discharging the duties of the office, it is his duty to keep that record whether required by law so to do or not; and such record is a public record belonging to the public, and not to the officer." In Cooper v. People, 28 Colo. 87, 63 Pac. 314, it is said: "Where a clerk of a district court entered in a book, in which he was not bound to make such entries, the receipt of fees collected by him, such book was properly admitted in evidence to prove the receipt of such fees in an action on the clerk's bond."

In Bridgewater v. Roxbury, 54 Conn. 213, 6 Atl. 415, it is held: To make entries in account books admissible in evidence, it is not always necessary that the transactions to which they apply should have been directly between the original creditor and debtor. In the same case it is held: Where the person who made entries in an account book, which is admissible in evidence, is beyond the reach of process, or is incompetent to testify, it is the same as though he were dead and his handwriting may be proved. Although McConville was not dead at the time of this trial, he was in the penitentiary. See note to State Bank v. Brown, 53 L.R.A. 513, and also note to Post B. & O. Employees Relief Asso. v. Kenerson, 52 L.R.A. 562, from which we quote:

"It is not true that the allowing of the original entries in books made at the time the transaction occurred, in the usual and regular course of business, by a party having personal knowledge of the transaction recorded, is permitted only from necessity; on the contrary, other and very strong reasons are given for the admission of such entities as evidence; first, they are a part of the res gestæ; secondly, general convenience is much promoted by their admission as evidence. These reasons would lead to the conclusion that such entries as above described, being proved to possess all these qualities, might properly be admitted as evidence whether the person who made them is produced in court or not, or whether his absence be accounted for or not,—especially if it were proved that his books were generally correctly kept. These entries are a part of the res gestæ whether he be present at the trial or not, and the general rule is that all the res gestæ may and should be proved to pro-

mote the ends of justice. All the requisites of such an entry, which we have specified above, may be proved by others to exist, as well as by the bookkeeper. Others may prove the entry to have been an original entry, made at the time and in the regular course of business, by one acquainted with the transaction recorded in the entry. Surely such an entry, as a part of these *res gestœ,* is in itself valuable evidence in our search for truth, even when unaided by the evidence of the bookkeeper; and it is regarded by the courts, as the decisions show, as legitimate evidence, though the bookkeeper in no manner supports it by his testimony."

This court in Dickinson v. White, 25 N. D. 523, 49 L.R.A.(N.S.) 362, 143 N. W. 754, disposes of the contention that this shortage was presumed to have occurred during the last term of office. From the foregoing authorities and many others cited in the L.R.A. notes, it is apparent that exhibits A and B were properly received in evidence.

This disposes of defendant's four separate defenses, and it follows that the judgment must be affirmed.